```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
HARRY MELENDEZ,                                 :
                                                :
                Plaintiff,                      :
                                                :
        -against-                               :      OPINION
                                                :
                                                :      06 Civ. 5898 (RLC)
MICHAEL J. ASTRUE,                              :
COMMISSIONER OF SOCIAL SECURITY                 :                                        :
                                                :
                Defendant.                      :
_____ X
```

APPEARANCES

Charles E. Binder
Binder and Binder, P.C.
215 Park Avenue South, 6th Floor
New York, New York 10003
*Attorney for Plaintiff*

Leslie A. Ramirez-Fisher
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
*Attorney for Defendant*

**ROBERT L. CARTER, District Judge**

Harry Melendez brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) challenging the final determination by the Commissioner of Social Security denying his application for Supplemental Security Disability ("SSD") and Social Security Income ("SSI") benefits. The Parties move for judgment on the pleadings pursuant to Rule12(c) of the Federal Rules of Civil Procedure.

**BACKGROUND**

Melendez was born in 1968 and has a 10th grade education. He lives in a fifth floor walk-up apartment with his wife and daughter. On August 7, 2001, Melendez injured his right ankle when he fell from a ladder at work.

On July 23, 2003, Melendez applied for SSI and SSD benefits with the Social Security Administration ("SSA"), claiming disability since 2001 due to his compromised vision and the ankle injury. His applications were denied initially. Administrative Law Judge Kenneth G. Levin ("ALJ") conducted a hearing on February 14, 2005, and found that Melendez was not under a disability. Melendez submitted a request to the SSA's Appeals Council for review of the decision. On June 21, 2006, the Appeals Council rejected the request, making the ALJ's decision final. Melendez now appeals.

    I.    *Administrative Hearing*

        a.  <u>Evidence from Treating Physicians</u>

            i.  Ankle Injury

The ALJ received into evidence medical records and reports from St. Luke's-Roosevelt Hospital ("St. Luke's"), where, on the day of his accident, Melendez was diagnosed with a right ankle fracture. Melendez underwent surgery there on August 8, 2001, and was discharged on August 10, 2001. He was seen in follow-up on September

2

4, 2001, complaining of mild right leg pain, and was diagnosed with status-post ankle fracture and advised no weight bearing for at least two more weeks. On September 27, 2001, Melendez denied pain, his cast was removed, and he was advised to maintain no weight bearing for four weeks. On October 30, 2001, his status was changed to weight bearing as tolerated, and he was prescribed physical therapy for range of motion and strengthening. On November 20, 2001, Melendez reported using a cane for stabilization with walking, but having increased pain with activity. X-rays dated December 10, 2001, showed a fractured fragment behind the tibia and bony fragments between the talus and medial malleolus.

      The ALJ also received into evidence medical records and reports from Dr. David Neuman. Melendez began to see Dr. Neuman on June 19, 2003, complaining of fluctuating right ankle pain. The doctor diagnosed healed fractures of the distal tibia and medial malleolus, irregularity of the articular surfaces between the tibia and the talus medially, and a fracture fragment posterior to the tibia consistent with posterior malleolus fracture. On July 3, 2003, Dr. Neuman diagnosed prominent painful hardware of the right ankle and posttraumatic arthrosis of the right ankle joint, and recommended removal of the hardware, continued weight bearing with a cane, and oral medication. On October 3, 2003, Dr. Neuman performed arthroscopic surgery and debridement of the right ankle, chondroplasty of the medial tibial platform and removal of one of the surgical screws. Dr. Neuman noted that Melendez was at risk for persistent pain and disability regarding the lower right extremity, and diagnosed post-traumatic degenerative joint disease. On November 13, 2003, Dr. Neuman reported that Melendez had 90% of range of motion in the right ankle. On December 18, 2003, Dr. Neuman advised Melendez to continue using

a cane as necessary for support and to continue with strengthening exercises, icing and elevating the ankle as necessary. On March 25, 2004, Dr. Neuman diagnosed status-post arthroscopy and posttraumatic arthritis status-post fracture of the right ankle, and advised Melendez to continue home exercise, physical therapy, and use of high-top shoes and a cane for support. Following a September 28, 2004, examination, Dr. Neuman noted that Melendez's ankle lacked a range of motion of five degrees in all directions, atrophy of the calf with softness, and less agility in the right side upon hopping. He advised Melendez to continue physical therapy, use ice, and elevate his leg. On March 24, 2005, Dr. Neuman, noting no change in Melendez's condition, prescribed Vicodin and encouraged Melendez to exercise and continue to elevate his ankle.

Upon the request of the government, Dr. Neuman completed a Medical Source Statement of Ability to do Work-Related Activities ("Medical Source Statement") on April 27, 2004. He opined that Melendez was able to carry/lift occasionally ten pounds and was limited to standing and/or walking less than two hours in an eight hour workday.

The ALJ also considered evidence from two consultative physicians: Dr. Arden Kaisman and Dr. Mohammad Khattak.

On April 26, 2005, Melendez consulted Dr. Kaisman, an anesthesiologist, who reported that Melendez remained totally disabled. Dr. Kaisman's examination noted decreased range of motion in the right ankle, pain on palpation, and crepitus. He prescribed Vicodin, and recommended physical therapy, range of motion exercises, cold packs to the right ankle, and elevation of the leg. On July 5, 2005, Dr. Kaisman diagnosed bimalleolar fracture of the right ankle and internal derangement of the right knee.

On August 28, 2003, Melendez consultated Dr. Khattak, a board certified surgeon, who noted right ankle dorsiflexion to 15 degrees, plantar flexion to 20 degrees, and that Melendez favored the right leg. Dr. Khattak diagnosed status-post healed fracture, rule-out traumatic arthritis of the right ankle, and opined that Melendez's ability to stand and walk might be mildly limited, but there were no other limitations.

### ii. Visual problems

Melendez has a long history of vision problems. His efforts at corrective surgery have been fruitless, his prescription bifocals induce headaches, and the shape of his eyes prevents him from wearing contact lenses. The ALJ received into evidence medical records from St. Luke's and Bellevue Hospital ("Bellevue"). Melendez was evaluated in the eye clinic at St. Luke's on September 9, 2002, where his uncorrected visual acuity was 20/200 and 20/400, and his corrected visual acuity was 20/60 and 20/80. He was diagnosed with hyperopia. On December 13, 2002, he was evaluated at Bellevue, where they measured his best visual acuity at 20/60 in the right eye and 20/80 in the left eye. On January 8, 2003, his uncorrected vision was measured at 20/200 in both eyes. He was evaluated again at Bellevue the following week, where his uncorrected bilateral acuity was measured at 20/400, and his corrected acuity was 20/60 and 20/80. He was also diagnosed with high hyperopia again.

The ALJ also received into evidence reports from Dr. Deborah Ruiz-Blenk, an ophthalmologist who evaluated Melendez on September 10, 2003, at the request of Social Security. She found that his visual acuity without correction at a distance and at near was 20/400 in both eyes. With correction, it improved to 20/100 in the right eye and 20/200 in the left eye. Dr. Ruiz-Blenk diagnosed high hyperopia with astigmatism, strabismus,

5

and dense amblyopia secondary to high refractive error and strabismus. She noted that Melendez had difficulty focusing because of a restricted field of vision and reported that Melendez's problem, while lifelong, was very debilitating. She concluded that his vision was likely stable at 20/100 and 20/200 when corrected.

### iii. Asthma

Melendez also has a long history of asthma. He was evaluated at the St. Luke's ambulatory care clinic on December 19, 2003, where he reported having suffered from asthma since childhood, no intubation, and no recent hospitalizations. The doctor diagnosed an upper respiratory infection and asthma. A pulmonary function test was performed on January 22, 2004, and he was started on Advair. Another pulmonary function test was performed on March 4, 2004, showing diminished capacity. The doctor referred Melendez to the St. Luke's chest clinic, where he was seen on March 29, 2004, and returned on April 26, 2004, and the doctor noted mild persistent asthma. When Melendez was seen at the chest clinic on October 4, 2004, he was again diagnosed with moderate persistent asthma.

### b. Testimony

### i. Plaintiff

Melendez testified that he was prevented from working because of the pain in his right ankle, asthma, and vision problems. He testified that over the last fifteen years he worked doing light construction in the garment district, and now depends on public assistance. His wife has assumed responsibility for household chores and he fills his days by watching television and keeping appointments. He testified that he was still in pain despite his surgeries, tires easily whether sitting for long periods or walking, and uses a

cane. He can lift and carry five to ten pounds and stand for ten to twenty minutes. He undergoes physical therapy consisting of massage, weight lifting of the joint, and stationary bicycling.

He has suffered from asthma since youth. He resorts to an inhaler after walking long distances or climbing stairs. He admitted to smoking, but testified that he stopped the month prior to the hearing. He stated that he used a home nebulizer approximately once a month.

He stated that his attempts at corrective surgery for his vision were unsuccessful, that he is disinclined to wear glasses because they cause him headaches, and he cannot wear contacts because his eyes are not round enough. His vision prevents him from reading newspaper print, but he can read newspaper headlines from near.

### ii. Medical Expert

Dr. Charles A. Plotz, an internist, appeared as a medical expert at the ALJ's behest. He testified that Melendez's compromised vision has not changed materially over the course of Melendez's life, and that while Melendez has a lifelong history of bronchial asthma for which he is medicated, his medical records show that he does not get frequent serious asthmatic attacks and his pulmonary function tests are mildly limited. Melendez's major limiting physical problem, according to Dr. Plotz, is his injured right ankle. He cited Melendez's persistent inability to use the right ankle in a normal fashion, and his limited ability to carry more than ten pounds. He opined that there is no reason to expect that Melendez would be limited in sitting, but would be restricted in combined walking and standing for more than two hours in the course of an eight hour day.

iii. Vocational Expert

Edna Clark, a vocational expert, also testified. She described Melendez as an "installer," which involves a medium exertional level job, and identified over 200,000 jobs in the national economy and over 2,500 in the local economy that might be available to him.

**DISCUSSION**

Judicial review of the Commissioner's denial of benefits is strictly limited. See Batista v. Chater, 972 F.Supp. 211, 217 (S.D.N.Y. 1997). The court may not determine de novo whether a claimant is disabled; rather, it may only set aside the Commissioner's decision if it is based on legal error or is not supported by substantial evidence in the record as a whole. See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971) (quotation marks and citations omitted)).

The SSA has promulgated a five-step sequential procedure for evaluating disability claims. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Id. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits his ability to do basic work activities. Id. If the claimant is severely impaired, the third inquiry is whether the claimant has an impairment listed in Appendix 1 of the regulations. Id. Fourth, if the claimant does not have a listed impairment, the claimant must show that he does not have the residual functional capacity to perform his past work. Id. Fifth and finally, if the claimant shows

he is unable to perform his past work, the burden then shifts to the Commissioner to show that the claimant still retains a functional capacity to perform alternative substantial gainful work that exists in the national economy, taking into account the claimant's age, education, and work experience.  Id.

Utilizing this procedure, the ALJ concluded that Melendez had not engaged in substantial gainful activity since the alleged onset of disability; that his impairments were severe; that his impairments did not meet or equal the level of severity of any impairment listed in Appendix 1, Subpart P, Regulation No. 4; and he was ineligible for benefits because, although he was unable to perform his past relevant work or the full range of sedentary work, there are a significant number of jobs in the national economy that he could perform, therefore the claimant was not under a disability as defined in the Social Security Act.

Capacity to stand and/or sit for certain amount of time.

Melendez argues that the ALJ erred by not recontacting Dr. Neuman about his capacity to stand and/or walk.  Dr. Neuman's Medical Source Statement indicated that Melendez could be expected to stand and/or walk for less than two hours in an eight hour workday.  Although Dr. Neuman was instructed to explain the precise extent of the limitation, he did not.  It remains unclear how much fewer than two hours he thinks Melendez has the capacity to stand and/or walk in an eight hour workday.  To fill this information gap, the ALJ extrapolated from Dr. Neuman's notes that Melendez was capable of being on his feet for two hours during a work day.

An obvious gap in the administrative record should prompt the ALJ to seek out more information from the treating physician and to develop the administrative record

accordingly. See Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) ("where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history"); see also Pratts v. Chatter, 94 F.3d 34, 37 (2d Cir. 1996) ("It is the rule in our circuit that the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding. This duty . . . exists even when . . . the claimant is represented by counsel.") (citations and quotation marks omitted) (alterations in the original). The ALJ ought to have pursued additional information from Dr. Neuman about the extent of Melendez's capacity to walk and/or stand. The ALJ's failure to satisfy his duty to develop the administrative record in this case amounts to legal error. The issue should be remanded for further development of the record.

      Putative need to elevate leg.

Melendez also argues that the ALJ ignored findings from numerous sources of the record that he needed to keep his right leg elevated throughout the day. He would have the case remanded for failure to consider relevant and probative evidence of disability. The Commissioner contends that no physician opined that Melendez needed to elevate his foot for any particular length of time or any particular part of the day. The Commissioner is right. Dr. Neuman only "encouraged" Melendez to elevate his right ankle as necessary (see Tr. 187, 214), and Dr. Kaisman issued a treatment plan that included "elevation" (Tr. 240) but made no precise recommendation.

      Nevertheless, the ALJ ought to have acknowledged the matter and included it in his weighing of the evidence. The ALJ has a legal duty to adequately develop the record, Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996), and consider it in its entirety, 20 C.F.R.

404.1520(a)(3).  It is grounds for remand "when it appears that the ALJ has failed to consider relevant and probative evidence which is available to him."  Lopez v. Sec'y of Dept. of Health and Human Servs., 728 F.2d 148, 150-51 (2d Cir. 1984).  The ALJ did not ask Melendez any questions about his putative need to elevate his legs.  He did not discuss it in his ruling either.  While factual determinations are within the ALJ's competence, these determinations must be manifestly informed by the evidence.  Sutherland v. Barnhart, 322 F. Supp. 2d 282, 290 (E.D.N.Y. 2004).  By neglecting to mention this part of the record which may have influenced his conclusion, the ALJ committed legal error.  The issue should be remanded for consideration of this omitted evidence.

<u>Dr. Ruiz-Blenk's opinion.</u>

Melendez argues that the ALJ improperly subordinated Dr. Ruiz-Blenk's opinion, and unduly relied on the opinion of a non-examining internist and his own lay opinion to find that Melendez's vision limited him from reading normal-size print or doing fine work.  The ALJ found that Melendez could perform work requiring gross vision.

Dr. Ruiz-Blenk parted company with the other consultative physicians by reporting that Melendez's best corrected vision was 20/100 and 20/200.  The ALJ noted the discrepancy and discounted her findings.  The Commissioner explained that they accorded more weight to the examination findings of Melendez's doctors at Bellevue because they were consistent with Melendez's testimony that his vision had not changed significantly since he was a child, and it had remained relatively constant during the preceding five to ten years.

11

Melendez objects that the ALJ unduly relied on incomplete Bellevue examination notes that did not indicate his near vision or his visual field, whereas the ALJ should have accorded more weight to Dr. Ruiz-Blenk's notes, which are, he contends, more detailed.

The court will not substitute its own judgment for that of the fact finder; where there is evidence to support the Commissioner or the claimant, deference will be paid to the decision of the Commissioner. See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). Furthermore, "[a]lthough we will not accept 'an unreasoned rejection of all the medical evidence in a claimant's favor,' the Commissioner does not need to 'reconcile explicitly every conflicting shred of medical testimony.'" Galiotti v. Astrue, No. 06-5013-cv, 2008 WL 501320, at *1 (2d Cir. Feb. 25, 2008) (quoting Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983)). "When there is a conflict in the medical evidence, we leave it for the finder of fact to resolve, and '[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner.'" Id. (quoting Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002)).

The ALJ was sufficiently persuaded by Melendez's testimony and demonstrated capacity to work and perform competitive activity involving at least gross vision to doubt the accuracy of Dr. Ruiz-Blenk's findings. Melendez's statements that there had been no change in his vision since the end of his childhood years, that he spent significant time watching television, was capable of managing alone on stairways and the subway, and could not read newspaper print but could read newspaper headlines were particularly poignant, and helped to satisfy the ALJ that his vision was moderately, not severely, reduced.

The ALJ also minded the medical evidence. He considered the St. Luke's report that largely accorded with the Bellevue Report, which measured his corrected acuity at 20/60 and 20/80. Also, Dr. Plotz testified that Melendez's history of vision problems has not changed materially over the course of his life, and while he was limited from doing any fine work requiring close vision, he was not foreclosed from doing the kind of work he has performed in the past.

The substantial evidence supports the ALJ's conclusion that Dr. Ruiz-Blenk's opinion should not control, and the ALJ was within his discretion in discounting it. See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)). Furthermore, as required, in rejecting Dr. Ruiz-Blenk's opinion, the ALJ pointed to the contradictory evidence that led him to disbelieve her appraisal. He acknowledged her dissenting viewpoint, but acted within the scope of his authority by rejecting the analyses of the other consultative physicians. The ALJ's determination was reached after consideration of the relevant evidence and conflicts in the record were resolved according to reasonable judgments.

Melendez also argues that the ALJ committed legal error by not recontacting Dr. Ruiz-Blenk for clarification. "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa, 168 F.3d at 79 n. 5 (citing Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996)). There is no clear gap in the record that precludes a finding of completeness, and the medical records are adequate to render a decision.

Severity of Melendez's asthma.

Melendez argues that the ALJ misunderstood the severity of his asthma, and that his finding about the appropriate environmental restrictions was not supported by the substantial evidence.

Although Melendez did not claim disability due to asthma when he applied for benefits in July 2003, the ALJ considered its effects on his residual functional capacity. The ALJ found that Melendez, an erstwhile smoker, has suffered from asthma since childhood, sometimes wheezes and uses an inhaler. He noted that Melendez was never prescribed steroids for his condition; that Dr. Plotz opined that Melendez's asthma appears to be neither serious nor to cause frequent exacerbations; that a recent pulmonary function test showed a mild defect; that Melendez uses a home nebulizer approximately every month; and that Melendez rode a bicycle and played baseball until he fractured his ankle. The ALJ determined that Melendez has a mild to moderate case of asthma, and found that he should not work around significant amounts of gases or fumes, or extremes of temperatures or humidity.

The Commissioner concedes that the ALJ's finding that Melendez was never prescribed steroids for his condition is a mischaracterization. Melendez was prescribed Advair on December 13, 2003, an asthma medication that contains a corticosteroid.

Melendez also takes issue with the ALJ's finding that he never requires emergency treatment for his condition. Melendez points to a December 19, 2003, treatment note indicating that he had been treated in the emergency room two days prior for fever, chest tightness, cough and yellow sputum, and was treated with a Nebulizer (Pl. Mem. at 18 citing Tr. at 138). Although Melendez contends that this incident illustrates a

14

continuing deterioration of his asthma, the decipherable portion of the treatment note is vague about whether these symptoms related to his asthma. More information is necessary to ascertain whether Melendez received emergency treatment for asthma on December 17, 2003.

Nevertheless, no purpose would be served by further development of the record on these points. Whether Melendez sought emergency room treatment for his asthma on December 17 or was prescribed a steroid preparation is immaterial; the verity of those facts would not attenuate the conclusion that he suffers from a mild to moderate case of asthma that can be accommodated by imposing a restriction from working around significant amounts of environmental irritants. After all, Melendez does not have an extensive history of hospital and emergency room admissions for treatments; he was diagnosed with mild persistent asthma in April 2004 and moderate persistent asthma in October 2004; he was admitted to the hospital for treatment as a child but not subsequently; he testified that while his asthma is bad, it is triggered predominantly by changes in the weather, pollen allergies, climbing multiple flights of stairs, and walking distances; he smoked approximately a pack of cigarettes every three days until 2005; he uses a nebulizer approximately once a month; the St. Luke's report indicates that he has had no change in his symptoms for more than eight years; and Dr. Plotz construed the record as showing that he does not seem to get frequent asthmatic attacks and his pulmonary function tests show a mild limitation. All of this amounts to substantial evidence to support the ALJ's conclusion.

<u>The ALJ's credibility finding.</u>

Melendez claims that the ALJ failed to properly evaluate his credibility.

"In determining whether a claimant is disabled, the Commissioner is required to consider all of the claimant's symptoms, including subjective complaints of pain." McCarthy v. Astrue, No. 07 Civ. 0300 (JCF), 2007 WL 4444976, at *8 (S.D.N.Y. Dec. 18, 2007).  Section 416.929(c)(3) of Title 20 of the C.F.R., as interpreted in SSR 96-7p, requires an ALJ to follow a two-step process to evaluate a plaintiff's contention of pain. First, "the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) . . . that could reasonably be expected to produce the individual's pain or other symptoms . . . ."  1996 WL 374186 at *2. Second, "the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . ." Id.  The adjudicator must consider the following factors to determine a plaintiff's credibility concerning his pain: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  Id. at *2-3.  An ALJ's finding that a witness lacks credibility must be "set forth with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 261 (2d Cir. 1988).  The ALJ must "mak[e] clear, both to the individual

and to any subsequent reviewers, the weight [he] gave the claimant's statements and the reasons for that weight." Snyder v. Barnhart, 323 F.Supp.2d 542, 547 (S.D.N.Y. 2004).

The ALJ explained perfunctorily that Melendez's allegations regarding his limitations were not totally credible "for the reasons set forth in the body of the decision." (Tr. 23.) It is lost on the court, however, why he deemed Melendez's testimony incredible. The ALJ's ruling does not allow the court to assess the substantiality of the evidence upon which the determination is based, as he seems to have neglected to apply the required factors as set forth above, therefore it contravenes the substantial evidence rule. See e.g., Green v. Astrue, No. 06 Civ. 5568 (DLC), 2007 WL 2746893, at *7 (S.D.N.Y. Sept. 17, 2007) ("Conclusory findings . . . will not survive district court review. An ALJ's decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record . . .") (internal quotation marks and citations omitted). The court recommends that the matter be remanded to the ALJ so that he can provide a credibility analysis that complies with the law and with the Regulations at 20 C.F.R. § 404.1428 and SSR 96-7p.

The ALJ's reliance on vocational expert testimony.

Finally, Melendez argues that the vocational expert's testimony cannot support a denial of benefits because it was based on a flawed hypothetical. A "vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job." Aubeuf v. Schweiker, 649 F.2d 107, 114 (2d Cir. 1981). There must be "substantial record evidence to support the assumption upon which the vocational expert based his opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983). "If a hypothetical question

17

does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." Futia v. Astrue, No. 1:06-cv-0961 (NAM), 2009 WL 425657, at *9 (N.D.N.Y. Feb. 19, 2009).

The ALJ asked the expert to assume a person of Melendez's age, education and work experience, and presented the following hypothetical:

> Assume . . . [he] cannot exertionally perform at higher than the sedentary level, by which I mean no significant limitations on sitting, but standing and/or walking not to exceed two hours in an eight-hour day at intervals, lifting and/or carrying not to exceed ten pounds. Further assume that this person would not be able to be exposed to significant environmental irritants because of a mild case of asthma. Further assume that he would be fully capable of doing gross work from a visual perspective, but not fine work, and more particularly such gross work as a person would have to have been able to do to do [sic] the job that he did for the last quite a few years before he fractured his ankle.

(Tr. at 261.)  As discussed above, the ALJ's decision to limit Melendez's exposure to significant environmental irritants and to limit him to gross work from a visual perspective is supported by the substantial evidence. However, the ALJ's determination that Melendez has the ability to stand and/or walk for up to two hours in a work day at intervals is not based on the substantial evidence. Neither is the ALJ's unelucidated decision to exclude from consideration Melendez's putative need to elevate his legs. The hypothetical was incomplete. The court recommends that the ALJ should obtain new vocational expert testimony based on a revised hypothetical.

## CONCLUSION

This case is remanded to the Commissioner for reconsideration in accordance with this Opinion.

**IT IS SO ORDERED.**

DATED:   New York, New York
         May 19, 2009

                                                    Robert L. Carter
                                              United States District Judge

19